*332 OPINION.
Trammell:
The question is, Did the notes received by Dinkier have a fair market value at the time received? At the end of 1924 no notice of cancellation of the lease had been given and in any event the makers were to be relieved from payment only of such portion *333 of the monthly notes of $1,000 as might remain unpaid if and when the Kimball House Operating Company lessee should vacate the premises pursuant to notice given by the lessor.
We must consider the conditions and circumstances at the time the notes were received, those facts known to exist or which were reasonably anticipated at that time, as well as the financial standing of the makers of the notes. The notes were not offered in evidence, but there was testimony to the effect that no one was asked to endorse them. From this testimony we think it necessarily follows as a conclusion that they were not endorsed by any one.
The Commissioner determined that the face value of the notes was their fair market value, they bearing interest at 7 per cent. A witness in behalf of the petitioner, experienced in handling notes and securities, testified that such a contingency clause which would relieve the maker of the obligation to pay would destroy the market value of the notes, or impair their marketability.
It is a generally accepted rule of law that a transfer of a debt will carry with it the security and operate as an equitable assignment thereof. See Thronateeska Pecal Co. v. Matthews, 277 Fed. 361; Meyer v. Ritter, 268 Fed. 937. This being true, any purchaser of the notes would have had notice of the contingency provision in the sale contract and the leases and it would have been necessary for any purchaser to have considered the probability of the happening of the contingency. If this contingency had a reasonable probability of happening, it would clearly have destroyed the value of any notes payable after such time when such contingency was likely to happen, regardless of the financial ability of the makers of the notes. The makers of the notes undoubtedly thought that they could postpone the construction of the viaduct for such length of time as to enable them to make some money on their transaction. In this they were undoubtedly taking a chance. We are impressed with the testimony of the witness for the petitioner,' however, that those engaged in the business of dealing in securities and promissory notes would not consider that such notes would have a market value. It was not definitely known when these notes were taken that more than twelve of the $1,000 notes would ever be a legal demand upon the makers. The petitioner contends in his brief that eighteen of the notes were affected by the contingency and does not contend that the remaining $1,000 notes were so affected. It is difficult to say that a note has a fair market value when any one taking it would have to take a gambling chance on whether it would be paid or even payable. It was well known in Atlanta that the viaduct was in contemplation and would undoubtedly be put in at some time. There was some question as to when this would happen and there was no assurance *334 when the transaction was closed in 1924 that definite steps in this direction would not have been taken much earlier than the summer of 1925. The contingency, however, related to the $1,000 notes only and not to the $10,000 note payable in January, 1925, and the $5,000 note which was due and payable on April 1, 1925. In other words, eighteen of the $1,000 notes were impaired in their marketability and value by the contingency to the extent that they had no market value when received.
With respect to all the other notes, amounting to $27,000, we think that the testimony is insufficient to show that their market value was less than their face value when received. The market value of notes may be affected by other factors than the actual value of assets of the makers. The makers were apparently men of standing in their community. They had their own business or profession aside from the operation of the Kimball House. They expected to make enough money from the Kimball House alone to pay the notes. It is also to be observed that all the notes were paid, and, considering all the testimony, we think that the petitioner has failed to show that the notes not affected by the contingency did not have a market value equal to their face.
We are not advised in this casé as to the cost or other basis of the stock which was sold. It was alleged in the petition and admitted in the answer that the stock in question was sold by L. J. Dinkier, Rosa G. Dinkier and Carling Dinkier and the contract of sale offered in evidence shows that it was signed by those persons. There is an allegation in the petition that certain shares of stock were given by L. J. Dinkier to Rosa G. Dinkier and Carling Dinkier, but no testimony was offered to support this allegation and the proposed findings of fact.by the petitioner state “petitioner owned the entire capital stock of the Kimball Operating Company,” which proposed finding we have adopted except for the change of the word “ decedent ” in place of the word “ petitioner,” the petitioner having died after the filing of the petition. For all that the testimony discloses, Rosa G. Dinkier and Carling L. Dinkier may have simply had stock in their name as qualifying shares, the stock really belonging to the decedent.
In view of these facts we have found that this stock was sold by the decedent and that he received the consideration therefor. From the evidence in the case, it is our opinion that the notes received by the decedent in 1924 constituted taxable income in that year to the decedent to the extent of $27,000.
Reviewed by the Board.

Judgment mil be entered under Rule 50.